In re Stephen J. MERRILL, doing business as Merrill & Associates and as Key Energy Resources, Inc., formerly doing business as Merrill & Merrill and as Horizon Exploration, Inc., Debtor.

Lori Ann Merrill, Individually and as Parent and Next Friend of April Michelle Merrill, Plaintiff—Appellee,

v.

Stephen J. Merrill, Defendant—Appellant.

BAP No. NO–00–023.
Bankruptcy No. 99–01456.
Adversary No. 99–0132.

United States Bankruptcy Appellate Panel of the Tenth Circuit.

Sept. 1, 2000.

Stephen J. Merrill of Tulsa, OK, for Defendant—Appellant.

John B. Nicks of Tulsa, OK, for Plaintiff—Appellee.

Before McFEELEY, Chief Judge, PUSATERI, and BOULDEN, Bankruptcy Judges.

## OPINION

McFEELEY, Chief Judge.

The Chapter 7 debtor, Stephen J. Merrill ("Debtor") appeals a judgment of the United States Bankruptcy Court for the Northern District of Oklahoma ("bankruptcy court") that excepted certain debts from discharge under 11 U.S.C. § 523(a)(4) and (5).[1] First, Debtor argues that the bankruptcy court erred when it found that it was collaterally estopped by a state appellate court judgment from reconsidering whether an account was established and governed by the Oklahoma Uniform Transfers to Minors Act ("UTMA"). Alternatively, the Debtor argues that the bankruptcy court erred when it found that the Appellant's withdrawal of money from the designated UTMA account established for his daughter was a defalcation and nondischargeable under § 523(a)(4). Second, Debtor contends that the bankruptcy court incorrectly applied the legal test under § 523(a)(5) when it found that the obligations owed to Lori Ann Merrill ("Appellee") were support and nondischargeable.[2]

We affirm.

## I. *Appellate Jurisdiction*

The Bankruptcy Appellate Panel has jurisdiction over this appeal. The bank-

---

**1.** Future references are to Title 11 of the United States Code unless otherwise noted.

**2.** Debtor also made a separate Motion to Supplement the Appendix ("Motion"). This Motion was unopposed. We grant the Motion and consider the supplement in this decision.

ruptcy court's judgment disposed of the adversary proceeding on the merits and is subject to appeal under 28 U.S.C. § 158(a)(1). *See Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 712, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996). The Debtor timely filed his notice of appeal pursuant to Fed. R. Bankr.P. 8002. The parties have consented to this Court's jurisdiction by failing to elect to have the appeal heard by the United States District Court for the Northern District of Oklahoma. 28 U.S.C. § 158(c)(1); Fed. R. Bankr.P. 8001; 10th Cir. BAP L.R. 8001–1.

## II. *Standard of Review*

For purposes of standard of review, decisions by judges are traditionally divided into three categories, denominated questions of law (reviewable *de novo* ), questions of fact (reviewable for clear error), and matters of discretion (reviewable for 'abuse of discretion'). *Pierce v. Underwood,* 487 U.S. 552, 558, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988); *see* Fed. R. Bankr.P. 8013; *Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1370 (10th Cir. 1996).

 Both the bankruptcy court's determination that it was collaterally estopped from reviewing the issue of whether the trust account was established and governed by the UTMA, and the issue of what constitutes a defalcation are issues of law, which we review *de novo.*

 A bankruptcy court finding with respect to whether an obligation is in the nature of support or in the nature of a property settlement are reviewable under a clearly erroneous standard. *See Goin v. Rives (In re Goin),* 808 F.2d 1391, 1393 (10th Cir.1987). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been

committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

## III. *Background*

On December 22, 1992, Appellee filed for divorce against the Debtor in Oklahoma state court ("State Court"). At approximately the same time, the Appellee applied for a temporary order restraining the Debtor from dissipating funds in a joint bank account and requesting, in relevant part, "support alimony and child support." Following the hearing on January 8, 1993, the State Court entered a Modified Temporary Restraining Order ("First TSO"). In the First TSO, the Debtor was ordered to pay the Appellee $2,500.00 per month in temporary support: $1,146.00 was determined to be temporary child support and $1,354.00 was characterized as "temporary alimony" ("Support Obligations").

The State Court held a second hearing pursuant to the Appellee's Application for Additional Temporary Order and Application for Direction on April 22, 1993. At the conclusion of the hearing, the State Court declined to change the amount of the support payment. While it reaffirmed the language in the First TSO that $1,146.00 was child support, it declined to characterize the $1,354.00 payment. It ordered the Debtor to pay these amounts from the $2,500 it allocated to the Appellee from the joint business income that the Debtor controlled. The State Court memorialized its April 22, 1993, hearing in an Additional Temporary Order and Directions ("Second TSO") on June 22, 1993. In the Second TSO, the State Court stated: "The characterization of the portion of those funds not attributable to child support shall be determined at time of trial." [3] The Second TSO further mandated that the Debtor "timely pay, maintain, and keep in effect, all life insurance policies on both parties," and that he "pay and main-

---

**3.** Although the Court's record contains only an excerpt of the April hearing transcript, it is clear that the Appellee testified as to her in-

come and expenses, stating that her expenses, excluding those paid by the Debtor, exceeded her gross income.

tain ... the cost of insurance on [a] Buick automobile...." ["Premium Obligations"]. At the hearing preceding the issuance of the Second TSO, the Debtor contested these Premium Obligations. The State Court did not characterize these payments as either support or a property settlement, nor did it indicate its intent to do so at the time of trial. However, the State Court indicated that the Premium Obligations were to be paid from the couple's joint income which was controlled by the Debtor. On January 10, 1994, the State Court denied Debtor's request to modify the Second TSO.

After a lengthy trial, a divorce decree was entered on January 7, 1997. The presiding State Court judge, who issued the divorce decree, was a different State Court judge than the one who entered the First and Second TSOs.

At trial the Debtor argued that the amounts due and unpaid under the First and Second TSO should be reduced or eliminated entirely. The Debtor did not dispute that he had failed to pay the Appellee a significant portion of the Support Obligations required to be paid under the First and Second TSO. Based on the evidence admitted at trial, the State Court reduced the Debtor's liability for child support and child care because the Appellee earned more than either TSO contemplated. Because the child support was reduced, the State Court declined to reduce the uncharacterized portion of the Support

Obligations.[4] In the divorce decree, the State Court expressly stated: "The Court finds that the referenced arrearages were ordered to be paid for the support and maintenance of the Plaintiff and the minor children." Divorce Decree, Plaintiff's Exhibit 1, Appendix, p. 227. Throughout the divorce decree, the State Court always refers to the Support Obligations as "temporary support" or "support alimony." Additionally, the State Court held the Debtor in "willful Indirect Contempt" for failure to pay the Support Obligations and ordered him to make monthly payments of $1,000 to the Appellee until the entire Support Obligation was paid.[5]

At the divorce trial, the Appellee argued that the Debtor should be required to repay approximately $9,000 he had taken from a trust set up for their daughter. Originally, the trust had been set up in 1984 as a "Clifford trust," allowing the couple to convey an income stream from an oil and gas property to their children while retaining ownership in the property. The trust terms authorized its trustees, the Debtor and the Appellee, to invest funds in oil and gas investments. In 1986, the couple opened a custodial account with Fidelity Investments ("Fidelity Account"). This account was designated as a Uniform Transfer to Minor Act account ("UTMA"). Prior to the couple's separation, the Debtor removed $9,000 from the Fidelity Account, and in accord with the trust but in violation of the UTMA, he invested the

---

**4.** The State Court stated:

As to the issue of support alimony, it should be noted that the original figure was set at $1,354.00 per month. The figure was based upon expenses of $3,300.00 and income of $800.00, plus $1,146.00 in child support. Based upon the court's review of Plaintiff's Exhibit 46, it appears that the Plaintiff's disposable income was $1,155.00, an increase of $355.00 [from the TSO proceedings]. The readjustment of the child care amount downward approximates the increase in disposable income. Accordingly, the Defendant's request for an adjustment of the support alimony is denied. The arrearage is $33,850.00 through November of 1996 [the time of the State Court trial].

Divorce Decree, Plaintiff's Exhibit 1, Appendix, p. 226.

**5.** At the divorce trial, the Appellee claimed that the Debtor had taken an unfair share of the income from their joint businesses. The Debtor countered that after he paid the family's expenses, and paid himself and the Appellee as directed by the Second TSO, there were no funds to escrow for division in the divorce proceedings. The State Court agreed with this analysis, and held that the Debtor owed the Appellee nothing from the income stream of the businesses. Divorce Decree, App. at 238.

funds in an oil and gas investment ("Trust Fund Transfer"). This investment was not profitable and the Fidelity Account was never replenished. The State Court held that the Debtor was not liable for the Trust Fund Transfer.

The Debtor, the Appellee, and the Department of Human Services moved to reconsider the divorce decree. The State Court denied the Debtor's motion, but granted the motion of the Appellee and the Department of Human Services in part. In so doing, the State Court modified the divorce decree on matters irrelevant to this appeal.

The Debtor then appealed the divorce decree to the Oklahoma Court of Civil Appeals ("Appeals Court"), and the Appellee cross-appealed. The Debtor argued that the State Court had erred in its property division, that it erred when it found him guilty of contempt, and that it erred when it failed to modify the Support Obligation due under the TSOs. Appellee contended that the State Court erred when it found that the Debtor was not liable for the Trust Fund Transfer. In August 1998 the Appeals Court affirmed in part and reversed in part. In so doing the Appeals Court rejected the Debtor's contentions of error below. However the Appeals Court reversed the State Court's Trust Fund Transfer ruling. It held that as a matter of law the Fidelity Account was a UTMA account and, that under the UTMA a gift to a minor is irrevocable and the trustee is charged with the "standard care that would be observed by a prudent person dealing with property of another."[6] The Appeals Court held that the Debtor violated the UTMA with the Trust Fund Transfer and, therefore, had to reimburse the Fidelity Account. The decision of the Appeals Court was appealed to the Oklahoma Supreme Court which refused certiorari in January 1999.

Under the divorce decree, the Debtor made some payments to the Appellee. A 1997 tax return indicates that he paid $12,000 in alimony. In the bankruptcy court the Debtor testified that the payment of the taxes, as shown on his tax return, was in accordance with the divorce decree and that if the Support Obligations were held dischargeable, he would amend his 1997 return.

The Debtor filed for Chapter 7 relief in 1999.[7] In the bankruptcy the Debtor argued that the amounts owed due to the Trust Fund Transfer, Support Obligations, and the Premium Obligations were dischargeable. In a Memorandum Opinion, the bankruptcy court found that all, including interest, were nondischargeable.[8] This appeal timely followed.

## IV. *Discussion*

In accord with the Bankruptcy Code policy of permitting debtors to attain a fresh start, most debts are dischargeable in bankruptcy. *See, e.g., In re Sampson,* 997 F.2d 717, 721 (10th Cir.1993). However, certain competing public policy interests, such as familial obligations, will trump the "fresh start policy." *Id.* Two such competing policy concerns are reflected in § 523(a)(4) and (5). Under these sections, in pertinent part, debtors are not discharged for any debt:

(4) for fraud or defalcation while acting in a fiduciary capacity....

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with separation agreement, divorce decree or other order of a court of record, determination made in accordance with state or territorial law by a governmental unit, or property set-

---

6. Okla.Stat. Ann. tit. 58, § 1201–26 (1993).

7. The exact date that the Debtor filed his Chapter 7 case is not part of the record.

8. *Merrill v. Merrill (In re Merrill),* 246 B.R. 906 (Bankr.N.D.Okla.2000).

tlement agreement, but not to the extent that—

. . . .

 (B) such debt includes a liability designated as alimony, maintenance or support, unless such liability is actually in the nature of alimony, maintenance, or support.

The plaintiff must establish by a preponderance of the evidence that the debt deemed nondischargeable falls within the statute's exceptions. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

The bankruptcy court found that Debtor's following obligations were nondischargeable: 1) under § 523(a)(4), the obligation incurred by the Debtor's Trust Fund Transfer on the grounds that the Debtor was a fiduciary who committed a defalcation when he wrongfully took money from the Fidelity Account; 2) under § 523(a)(5), the Support Obligations on the ground that the money owed was support.

■■ In order to prove that the debt represented by the Trust Fund Transfers is excepted from discharge under § 523(a)(4), the Appellee must establish: 1) that the Debtor had a fiduciary relationship with respect to his management of the Fidelity Account; and 2) that the Debtor committed fraud or defalcation in the course of that fiduciary relationship. *See Holaday v. Seay (In re Seay)*, 215 B.R. 780, 785–86 (10th Cir. BAP 1997). Exceptions to discharge under § 523(a) are construed narrowly. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Doubt is resolved in the debtor's favor. *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir.1997).

When evaluating the Debtor's dischargeability under § 523(a)(4) with respect to the Trust Fund Transfer, the bankruptcy court found it was collaterally estopped by the Appeals Court judgment from revisiting the following issues: 1) whether the Fidelity Account was established and governed by the UTMA;[9] 2) whether, under the UTMA, the Debtor was a fiduciary in his position as custodian of the Fidelity Account; 3) whether the Debtor removed $9,000 from the UTMA account; and 4) whether the money taken by the Debtor was invested in an oil and gas venture and ultimately lost. *In re Merrill*, 246 B.R. at 921. The Debtor argues that the bankruptcy court was not collaterally estopped from revisiting the issue of whether the Account was a UTMA account because the dischargeability of the account was not an issue in the State Court.

■ While a bankruptcy court ultimately determines whether a debt is nondischargeable under § 523, a state court judgment may preclude the relitigation of settled facts under the collateral estoppel doctrine. *See In re Wallace*, 840 F.2d 762, 765 (10th Cir.1988). When a federal court reviews the preclusive effect of a state court judgment, the full faith and credit statute directs a federal court to look to the preclusion law of the state in which the judgment was rendered. *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985).[10] Under Oklahoma law, collateral estoppel is a doctrine that prevents the relitigation of an issue of ultimate fact that has already been determined by a valid judgment in previous litigation between the same parties. *Fent v. Oklahoma Natural Gas Co.*, 898 P.2d 126, 133 (Okla.1994) (stating "once a court had decided an issue of fact or law neces-

---

**9.** Throughout its opinion, the bankruptcy court refers to the UTMA as the Uniform Gift to Minor's Act ("UGMA"). While the bankruptcy court correctly cites the UTMA and indicates that the act is sometimes called the UTMA, it is incorrect in its statement that the UTMA may be known as "the UGMA or the

UTMA." *In re Merrill*, 246 B.R. at 906. In 1986 in Oklahoma the UGMA was repealed, and the UTMA subsequently was enacted.

**10.** The "full faith and credit statute" is found at 28 U.S.C. § 1738.

sary to its judgment, the same parties or their privies may not relitigate the issue in a suite brought upon a different claim."). However, preclusion will only bar relitigation of a factual issue if the party was afforded a "full and fair opportunity" to litigate the critical issue in the prior action. *Fent*, 898 P.2d at 133.

 The Appeals Court held as a matter of law the following: 1) the Fidelity Account was a UTMA account; 2) the Debtor was a fiduciary under the UTMA statute; and 3) the Debtor wrongfully removed money from the Fidelity Account. All of these findings were necessary to the Appeals Court holding that the Debtor was legally liable for repayment of the account. Additionally, the Debtor had a full and fair opportunity to litigate these issues both during the extensive State Court trial and in the subsequent Appeal.[11] The bankruptcy court correctly found that it was collaterally estopped from revisiting these factual issues under the collateral estoppel doctrine and the full faith and credit statute.

Debtor's argument fails because it confuses the factual and legal issues of the bankruptcy court's analysis under § 523(a)(4).[12] Collateral estoppel operates to preclude the relitigation of factual issues in suits brought on different claims. *Fent*, 898 P.2d at 133. The bankruptcy court correctly found that it was estopped from reconsidering already established factual issues. Based upon those established facts, the bankruptcy court then properly applied the legal standards of § 523(a)(4) to determine if the debt was dischargeable.

Alternatively, the Debtor suggests that the bankruptcy court erred in its determination that the Trust Fund Transfer was a defalcation because the Appeals Court never considered whether the Debtor violated a fiduciary duty. He argues that the bankruptcy court mistakenly accepted the Appeals Court holding that the Debtor was "wrong" when he took money from the Fidelity Account without separately considering whether the Debtor was a fiduciary and whether his conduct amounted to a breach of that duty. We do not agree with the Debtor.

 The Tenth Circuit has construed narrowly the phrase "fiduciary capacity" in § 523(a)(4). *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1371–72. The court has stated that while the existence of a fiduciary relationship is determined under federal law, state law is relevant to the inquiry. *Id.* State law is an important factor in determining when a trust relationship exists. *Cf. Grogan*, 498 U.S. at 283, 111 S.Ct. 654 (stating [t]he validity of a creditor's claim is determined by rules of state law). A fiduciary relationship will exist only where there is an express or technical trust. *In re Young*, 91 F.3d at 1371–72; *see also, In re Seay*, 215 B.R. at 786. When a state law has created a fiduciary relationship, it must have imposed a trust on a property and delineated the fiduciary duties. *State of Illinois, Dep't of the Lottery v. Marchiando (In re Marchiando)*, 142 B.R. 246 (N.D.Ill.1992). The fiduciary relationship must exist prior to the act creating the debt in controversy. *In re Young*, 91 F.3d

11. We note that the only fact at issue is whether the Fidelity Account was a UTMA account. Debtor admitted the following in the adversary proceeding: 1) that he was sole custodian of the Fidelity Account; 2) that he withdrew money from the Fidelity Account; and 3) that he invested the monies from the Fidelity Account in an oil and gas venture and lost the money.

12. Debtor spends much of his brief arguing that the Fidelity Account is not a UTMA account because the account was not set up in compliance with the UTMA's statutory scheme. He urges this court to find that the Fidelity Account is not governed by the UTMA, but by the terms of the original Clifford trust. According to the Debtor, under the terms of the Clifford Trust, he did not violate his fiduciary duties. Although Debtor attempts to frame this argument as a legal argument, it is a factual question that was determined by the Appeals Court. As we have noted, we are collaterally estopped from revisiting the issue of the nature of the trust.

at 1373. When a fiduciary breaches a duty imposed upon him by agreement of the parties or by operation of law, that breach is non-dischargeable as a defalcation regardless of intent. *See Antlers Roof–Truss and Builders Supply v. Storie (In re Storie)*, 216 B.R. 283, 286 (10th Cir. BAP 1997). Fiduciaries are accountable for a knowledge of the law and their duties. *Id.*

▬▬▬ The UTMA is an Oklahoma statutory trust.[13] Under the UTMA, the custodian of a UTMA account is a fiduciary, and the funds in a UTMA account are an irrevocable gift to the account holder.[14] As observed earlier, the bankruptcy court was collaterally estopped from reconsidering the issue of whether the Fidelity Account was a UTMA account. The bankruptcy court correctly found that the UTMA statute was a trust that imposed a fiduciary duty on the Debtor.[15] *In re Merrill*, 246 B.R. at 922. Under § 523(a)(4), when a fiduciary improperly takes trust funds, it is a defalcation. *In re Storie*, 216 B.R. at 286.[16] Intent is not an issue. *Id.* The bankruptcy court correctly held that the Trust Fund Transfer by the Debtor, a fiduciary as defined by the UTMA statute, was a defalcation under § 523(a)(4).

▬▬▬ Pursuant to § 523(a)(5), whether an obligation to a former spouse is support is a factual question that is resolved according to bankruptcy law, not state law. *In re Sampson*, 997 F.2d at 721. Under *Sampson* there is a two prong approach: 1) the court must divine the spouses' shared intent as to the nature of the payment: 2) it must then determine that the substance of the payment was in the nature of support at the time of the divorce—i.e., whether the surrounding facts and circumstances, especially financial, lend support to such a finding. *Id.* at 725–26. When the bankruptcy court reviews a divorce decree, "it must determine what was intended by the court in entering the decree and whether the evidence adduced in support of the decree justifies the court's characterization of the payments as alimony." *Young v. Young (In re Young)*, 35 F.3d 499 (10th Cir.1994). "The term 'support' is to be read broadly and in a realistic manner." *Dewey v. Dewey (In re Dewey)*, 223 B.R. 559, 564 (10th Cir. BAP 1998) (citing *Miller v. Gentry (In re Miller)*, 55 F.3d 1487, 1489–90 (10th Cir.1995).

After evaluating the intent of the State Court under the first prong of the *Sampson* test, the bankruptcy court held that the State Court had intended that the Support Obligations and the Premium Obligations were "support" because it had expressly stated so in the divorce decree. *In re Merrill*, 246 B.R. at 917.

**13.** Uniform Transfers to Minors Act, Okla. Stat.tit. 58, § 1212 et seq.

**14.** Uniform Transfers to Minors Act, Okla. Stat.tit. 58, § 1212(b).

**15.** The Appeals Court's use of the word "wrong" does not appear to encompass an evaluation of the Debtor's intent. It observed:

> The property given to a minor under the UTMA remains hers and no custodian may "redeem" the bulk of those funds, as Husband [Debtor] says he did, and invest the money according to what is permitted by the separate trust agreement. We therefore hold that Husband was wrong to take money from his daughter's UTMA account, and the trial court erred when it said Husband did not have to reimburse that account for the money taken. Appellant App. at 284.

**16.** Debtor makes an additional argument that under the UTMA he did not violate his fiduciary duties because the UTMA not only permits but mandates that a custodian who has special skills or expertise "shall use that skill or expertise." Uniform Transfers to Minors Act, Okla.Stat.tit. 58, § 1213(B) (1991). He contends that he correctly fulfilled his duties under the UTMA when he invested the monies he took from the Fidelity Account. Debtor misses the point. The question at issue is not whether he wrongfully invested the Trust Fund Transfer monies, but whether the debt subsequently incurred was nondischargeable under § 523(a)(4). As we have observed, the UTMA dictates that all transfers to a UTMA account are irrevocable gifts. Uniform Transfers to Minors Act, Okla. Stat. tit. 58, § 1212(b) (1991).

Debtor contends that the bankruptcy court incorrectly applied the first prong of the *Sampson* test with respect to the Support Obligations. The Debtor's argument is that the bankruptcy court wrongfully evaluated the intent of the judge presiding over the divorce trial when it should have examined the intent of the judge presiding over the First and Second TSOs. He argues that the first judge could not have intended that the obligations be support because the Debtor could not afford to pay the Support Obligations and that the first judge's findings with respect to Appellee's income, the value of assets, and his own income were erroneous.

 Debtor's arguments are completely without merit. The judge presiding over the TSOs expressly stated that the imposed obligations would be characterized as either support or a property settlement during the divorce trial. These obligations were evaluated by the second judge at the divorce trial and ultimately determined to be a Support Obligations. Furthermore, at the divorce trial the TSO obligations were reduced to their current sum to more accurately reflect the incomes and needs of the Debtor and the Appellee; it is this sum that is at issue, not the sum imposed by the TSOs. We note that Debtor's arguments with respect to his ability to pay the obligation and with respect to the findings behind the obligations imposed by the TSOs are collateral attacks on the TSOs and inappropriate here. The bankruptcy court did not err in concluding that the State Court intended the Support Obligations to be "support" under § 523(a)(5).

 Debtor further argues that the bankruptcy court did not correctly apply the second prong of the *Sampson* test to the Support Obligations or the Premium Obligations because the Appellee did not meet her burden of proof in proving that

these debts were nondischargeable under 523(a)(5).[17] Initially, Debtor argues that the Appellee had to show that she suffered hardship as a result of the Debtor's failure to pay either the Support Obligations or the Premium Obligations. We disagree with the Debtor's interpretation of the second prong of *Sampson*.

 Under *Sampson*, the test is whether at the time of the divorce the Appellee was in a financial situation which would render any court-ordered payments to be viewed as support. *See Sampson*, 997 F.2d at 725. As previously noted, the Tenth Circuit has stated that support is to be interpreted broadly, and that "[t]he critical question in determining whether the obligation is, in substance, support is the 'the function served by the obligation at the time of divorce.'" *Sampson*, 997 F.2d at 725–26 (quoting *In re Gianakas*, 917 F.2d 759, 763 (3d Cir.1990); *In re Dewey*, 223 B.R. at 565). The financial consequences of the Debtor's failure to comply with the State Court's First TSO and Second TSO are irrelevant. *Sylvester v. Sylvester*, 865 F.2d 1164 (10th Cir.1989) (per curiam).

Alternatively, the Debtor argues that the Appellee failed to establish under *Sampson* that she needed either the Support Obligations or the Premium Obligations at the time of the divorce. The Debtor's arguments are as follows: 1) the bankruptcy judge did not conduct an accounting of the Appellee's actual expenses during the time at issue; 2) the Appellee survived although the obligations were not paid; 3) the Appellee was underemployed and therefore, had no real need of the support; and 4) the Premium Obligations composed of life and automobile insurance were not support because they were insurance obligations, and the bankruptcy court can look with hindsight on these debts and see that they were not needed. The bank-

---

**17.** The Appellee contends that the Debtor has not properly preserved certain of these issues for review because they were not specifically raised in his statement of issues. This argu-

ment is without merit as the Debtor's statement of issues is broad enough to encompass the issues he raises.

ruptcy court considered and dismissed all of these arguments.

In its consideration of the Debtor's first argument, the bankruptcy court declined to conduct an accounting. The bankruptcy court observed, and we concur that there was an ample record [18] before it with which to make an evaluation of the Appellee's need. *In re Merrill,* 246 B.R. at 918 (stating "the State court considered in great detail the relative income and expenses of the Plaintiff and the Defendant at the time it entered the First TSO, the Second TSO and the trial of the Divorce Action)." The bankruptcy court found the second argument specious, stating that there is no requirement under § 523(a)(5) that a Plaintiff not survive. *Id.* at 919. (finding that such a requirement would render § 523(a)(5) a nullity). With respect to Debtor's third argument, the bankruptcy court found it highly improper and speculative in the absence of anything in the State Court record to support Debtor's allegations that the Appellee was underemployed. *Id.* at 918–19. Finally, the bankruptcy court found that the purpose behind requiring the Debtor to pay the auto insurance portion of the Premium Obligations was to relieve the Appellee of the debt so as to allow her to use her limited income for support. *Id.* at 916. The bankruptcy court further found that the Debtor's payment of the life insurance premiums was support because it ensured the support of the Appellee in the event of

the Debtor's death. *Id.* The bankruptcy court noted that Debtor's argument that it could look with hindsight on these premiums and take into consideration that they were not needed was unsound as the point of the insurance was to protect against risk. *Id.* at 917.

We note that all of the arguments the Debtor made before the bankruptcy court with respect to Appellee's "need" of the Support Obligations and the Premium Obligations were made both in the State Court and in the Appeals Court. These issues have been litigated extensively and there was an ample record for the bankruptcy court to evaluate. Its findings were not clearly erroneous.

■ Debtor's final argument is that under § 523(a)(15),[19] the bankruptcy court can look at the Appellee's current financial situation and see that the payments are not support because Appellee is supporting herself without them. As the bankruptcy court correctly noted, a Plaintiff's current financial condition is irrelevant to the § 523(a)(5) inquiry. *In re Merrill,* 246 B.R. at 919. The Tenth Circuit has expressly stated that a nondebtor's spouses's current financial situation is totally irrelevant to a § 523(a)(5) analysis. *Sylvester,* 865 F.2d at 1166 (stating that [a] requirement that the former spouse's present need for support or changed circumstances be analyzed in determining dischargeabili-

---

**18.** The record on appeal includes transcripts of evidentiary hearings held in the state court that related to the financial condition of the parties at the time of the divorce. Given the extensive sworn testimony that was already available, it was unnecessary for the bankruptcy court to conduct a further evidentiary hearing that would only have elicited similar cumulative evidence.

**19.** Section 523(a)(15) provides in relevant part that a debtor is not discharged for any debt:

(15) not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of

record, a determination made in accordance with State or territorial law by a governmental unit unless—

(A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or

(B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse or child of the debtor.

§ 523(a)(15).

ty finds no support in either the language or the legislative history of § 523(a)(5).). The only time that is relevant under § 523(a)(5) is the time of the divorce. *Sampson,* 997 F.2d at 725; *Sylvester,* 865 F.2d at 1166.

### V. *Conclusion*

For the reasons set forth above, the bankruptcy court's holding that the Debtor's Support Obligations, Premium Obligations, and Trust Fund Transfer Obligation is nondischargeable is AFFIRMED.